**RESIDENTIAL FUNDING CORPORATION, Plaintiff–Appellee,**

v.

**DeGEORGE FINANCIAL CORP., DeGeorge Home Alliance, Inc. and DeGeorge Capital Corp, Defendants–Appellants.**

No. 01–9282.

United States Court of Appeals, Second Circuit.

Argued: Aug. 8, 2002.

Decided: Sept. 26, 2002.

---

Jonathan Ross, Erica W. Harris (Susman Godfrey, L.L.P., Houston, TX), for Defendants–Appellants.

Jeffrey A. Hall, Philip S. Beck, Steven E. Derringer, Rebecca L. Weinstein (Bartlit Beck Herman Palenchar & Scott, Chicago, IL); Joshua W. Cohen (Cummings & Lockwood, Stamford, CT), for Plaintiff–Appellee.

Before JACOBS, CABRANES, and F.I. PARKER, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

We consider here the standard district courts should employ in determining whether a party's failure to comply with discovery requests warrants the imposition of sanctions.

DeGeorge Financial Corp., DeGeorge Home Alliance, Inc., and DeGeorge Capital Corp. (collectively, "DeGeorge") appeal from a final judgment in favor of Residential Funding Corporation ("RFC") entered by the United States District Court for the District of Connecticut (Janet Bond Arterton, *Judge*) after a jury trial on cross-claims for breach of contract. On appeal, DeGeorge challenges only the District Court's denial of its motion for sanctions—in the form of an adverse inference in-struction—for RFC's failure to produce certain e-mails in time for trial. The District Court denied the motion based on its finding that the delay in producing the e-mails was not caused by an action of RFC that was taken in bad faith or with gross negligence and its finding that DeGeorge had not shown that the missing e-mails would be favorable to its case.

We hold that (1) where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, a District Court has broad discretion in fashioning an appropriate sanction, including the discretion to delay the start of a trial (at the expense of the party that breached its obligation), to declare a mistrial if trial has already commenced, or to proceed with a trial with an adverse inference instruction; (2) discovery sanctions, including an adverse inference instruction, may be imposed where a party has breached a discovery obligation not only through bad faith or gross negligence, but also through ordinary negligence; (3) a judge's finding that a party acted with gross negligence or in bad faith with respect to discovery obligations is ordinarily sufficient to support a finding that the missing or destroyed evidence would have been harmful to that party, even if the destruction or unavailability of the evidence was not caused by the acts constituting bad faith or gross negligence; and (4) in the instant case, the District Court applied the wrong standard in deciding DeGeorge's motion for sanctions.

Accordingly, we vacate the order of the District Court denying DeGeorge's motion for sanctions and remand with instructions for a renewed hearing on discovery sanctions.

## I. BACKGROUND

This litigation involved cross-claims for, *inter alia,* breach of contract, with the

parties' dispute centered principally on events in the latter part of 1998. RFC initiated the case by filing suit on January 15, 1999, in Minnesota state court. DeGeorge counterclaimed on February 11, 1999.

On May 7, 1999, DeGeorge filed a petition for bankruptcy in the United States Bankruptcy Court in the District of Delaware. The bankruptcy proceeding was subsequently transferred to the District of Connecticut.

After the bankruptcy filing, RFC removed the Minnesota state court action to the United States District Court for the District of Minnesota. On January 14, 2000, that Court transferred the case, on the parties' joint request, to the District of Connecticut.

On April 7, 2000, RFC moved to refer the case to the bankruptcy court, and, on July 21, 2000, it moved to stay discovery. After an extended briefing period, the District Court denied both motions on December 27, 2000.

On January 4, 2001, the parties held a discovery planning conference pursuant to Rules 16(b) and 26(f) of the Federal Rules of Civil Procedure and Rule 38 of the Local Rules of the District of Connecticut. Report of Parties' Planning Meeting dated January 5, 2001, at 1. At that meeting, the parties agreed that discovery would commence "immediately" and be completed by August 1, 2001, and that the case would be ready for trial by September 1, 2001. *Id.* at 10–11. On January 19, 2001, the District Court entered a scheduling order reflecting the parties' agreed-upon discovery schedule. Scheduling Order on Counterclaim dated January 19, 2001, at 1.

On April 12, 2001, DeGeorge served its document discovery requests, which included a request for all documents, including electronic mail, relating to DeGeorge.

RFC responded to DeGeorge's document requests on May 22, 2001, and asserted no objection to the request for e-mail.

During the first week of June 2001, the parties agreed that they would "work diligently to obtain hard copies of emails that were in computer form so that [they] could have a mutual production of emails." E Mail from Attorney E. Harris to Attorney R. Weinstein re: Production of Emails, dated June 8, 2001. On June 8, 2001, RFC told DeGeorge that it was "in the process of retrieving e-mails from the back-up tapes" and that "[it] would let [DeGeorge] know when it had an estimate on a production date for the e-mails that are being retrieved off of the storage tapes." E-mail from R. Weinstein to E. Harris re: Production of Emails, dated June 8, 2001.

In mid-June 2001, after RFC's in-house lawyer responsible for technology issues determined that "RFC did not have the internal resources necessary to retrieve [the e-mails from the back-up tapes] in the permitted time frame," Decl. of Michael McGuire, dated Sept. 19, 2001, ¶ 3, RFC retained Electronic Evidence Discovery, Inc. ("EED") to assist RFC in the e-mail retrieval project. *Id.* ¶¶ 3–4.

In early July 2001, RFC informed DeGeorge that it had been unable to retrieve any emails from its back-up tapes. DeGeorge requested copies of the back-up tapes so that it could have its technical experts attempt to retrieve e-mails from them, and indicated its willingness to enter into any requested confidentiality agreement. E-mail from E. Harris to R. Weinstein re: Refusal to produce back up tapes, dated July 10, 2001. RFC refused to produce the back-up tapes, prompting DeGeorge to raise the issue with the District Court. *See id.*

On July 12, 2001, at a settlement conference before Magistrate Judge Joan G. Margolis, DeGeorge raised the issue of

RFC's refusal to produce e-mails or back-up tapes. The parties agree that RFC told Magistrate Judge Margolis that it "was going to engage a vendor" to retrieve the emails. *See* RFC Memorandum Opposing Mot. for Sanctions at 2–3; DeGeorge Mot. for Sanctions at 3 ("At that time, RFC represented to the Magistrate Judge and DeGeorge that it would hire a vendor to retrieve the emails."); Appellants Br. at 3 (same).[1] The parties understood at the July 12, 2001 conference that RFC would produce e-mails with the assistance of a vendor.

On or about July 25, 2001, EED apparently informed counsel for RFC that it would take "a couple of weeks" for it to print out the e-mails and transmit them to counsel for review. *See* Tr. of Telephone Conf. of August 15, 2001, at 27. RFC, in turn, informed DeGeorge that day that it would begin producing responsive e-mails on a rolling basis starting on August 6, 2001. E-mail from R. Weinstein to E. Harris re: Emails, dated July 25, 2001. It represented that the e-mails would take "a few weeks" to produce. *Id.* At this point, discovery was set to close on August 1, 2001, with jury selection to begin on September 5, 2001. Supplemental Scheduling Order, dated July 18, 2001.

RFC did not begin producing e-mails on August 6, 2001, as it had promised. Instead, it informed DeGeorge on August 9, 2001, that it was continuing work on the production of e-mails and that "[s]o far[,] most [of the e-mail printouts it had received from EED are] completely unrelated to the case." E-mail from R. Weinstein

to J. Ross re: PRD boxes, dated August 9, 2001.

By August 15, 2001, DeGeorge still had not received any production of e-mails from RFC. Accordingly, it raised the matter in a conference call with Judge Arterton on that date. *See* Tr. of Telephone Conf., dated August 15, 2001, at 24. RFC informed Judge Arterton that it had encountered technical difficulties, but that it expected to complete production "in the next couple of weeks." *Id.* at 25. Judge Arterton ordered that production of the e-mails be completed by August 20, 2001. *Id.* at 27.

RFC did not produce a single e-mail between August 15 and August 20, 2001. Instead, it informed DeGeorge on August 21, 2001, that EED was just beginning to print out e-mails due to additional "technical problems" and that responsive e-mails would be forthcoming "over the next couple of days." E-mail from R. Weinstein to E. Harris re: Back-up tape e-mail, dated August 21, 2001.

On August 24, 2001, RFC produced 126 e-mails dating from January 1998 through early August 1998, and 2 e-mails from September 1998. There were no e-mails produced from October to December 1998—the critical factual time period.

DeGeorge immediately inquired as to the reason there were no e-mails from the end of 1998. E Mail from E. Harris to J. Hall et al. re: Emails produced from Back Up Tapes, dated August 24, 2001 at 11:57 a.m.; *see also* E Mail from E. Harris to R. Weinstein et al. re: Emails produced from

---

1. The July 12, 2001, conference was not transcribed or otherwise recorded. Accordingly, we must rely on the parties' recollection of what transpired. We take this opportunity to strongly encourage district courts to preserve a record of discovery conferences, although there is no requirement that they do so. We also remind counsel that, in the event a district court ordinarily chooses not to employ a court reporter or recording device at a discovery conference, a party may itself undertake to insure that a record of the conference is preserved by making an appropriate application to the Court or by providing its own court reporter.

Back Up Tapes, dated August 24, 2001 at 4:45 p.m. RFC responded that "[i]f there were no responsive e-mails for 10/98–12/98 ... it was either because there were no responsive e-mails from that date or because they did not exist on the accessible back-up tapes." E-mail from R. Weinstein to E. Harris et al. re: Emails produced from Back Up Tapes, dated August 24, 2001, at 5:50 p.m. On August 27, 2001, RFC confirmed that it had been "unable to retrieve October December 1998 e-mails for production from RFC's back-up tapes." Letter from R. Weinstein to L. Harris, dated August 28, 2001.

On August 29, 2001, RFC produced 30 additional responsive e-mails retrieved from back-up tapes, none of which were from October to December 1998.

On September 1, 2001, DeGeorge again asked RFC to produce the back-up tapes so that it could investigate why no e-mails had been produced from the critical time period. On September 3, 2001, RFC agreed to provide the back-up tapes on the condition that any e-mails DeGeorge's vendor was able to retrieve be sent to RFC for review rather than to DeGeorge. The next morning, after initially rejecting the condition, DeGeorge agreed to RFC's terms in an e-mail sent at 11:17 a.m. E-mail from E. Harris to J. Hall et al. Re: Back Up tapes for Emails, dated Sept. 4, 2001. In that e-mail, DeGeorge requested that the tapes be made available the next morning at jury selection. *Id.* RFC did not produce the tapes at jury selection; instead, it sent them by overnight courier on September 5, 2001, *see* Letter from R. Weinstein to E. Harris, dated Sept. 5, 2001, so that DeGeorge did not receive them until the morning of September 6, 2001–three days before trial was to begin.

Although RFC turned over the back-up tapes, it refused to answer DeGeorge's questions regarding what type of tapes had been produced and their technical characteristics-information DeGeorge sought to assist its vendor in reading the tapes. Instead, RFC took the position that it had fulfilled its discovery obligations by producing the tapes, and that DeGeorge's vendor should just try to figure it out as RFC's vendor had done. DeGeorge brought RFC's recalcitrance to the attention of the District Court in a telephone conference held that day (September 6, 2001), during which RFC agreed to answer DeGeorge's questions.[2] *See* RFC's Mem. Opposing DeGeorge's Mot. For Sanctions at 4.

The next day—September 7, 2001—DeGeorge asked RFC to ask its vendor why it could not retrieve anything from the October December 1998 tapes. RFC responded that "the reason no e-mails were produced for 10–12/98 from the back-up tapes you received was either due to the fact that some of the tapes were physically damaged or corrupted or some tapes did not have e-mail on them at all." E-mail from R. Weinstein to E. Harris re: Emails, dated September 7, 2001.

Within four days of obtaining the tapes, "working a normal eight hour day," DeGeorge's vendor had located 950,000 e-mails on the November and December 1998 tapes. Aff. of Don Wells, dated Sept. 18, 2001, ¶¶ 2–4. By September 13, 2001, the vendor had begun forwarding printed e-mails to RFC's counsel for review and production. *Id.* ¶ 5. Because of time pressure, the parties agreed that RFC would produce all of the 4,000 e-mails that DeGeorge's vendor had been able to print out; RFC did so in court on September 14, 2001. Ultimately, thirty of the 4,000 e-

2. This conference was not transcribed or otherwise recorded. *See* note 1, *ante*.

mails were responsive, though none appear to be damaging to RFC.

On September 18, 2001, DeGeorge moved for sanctions, asking Judge Arterton to instruct the jury that "it should presume the emails from October to December of 1998, which have not been produced, would have disproved RFC's theory of the case." The next day, during oral argument on the motion, RFC's counsel described RFC's retention of EED as follows:

> I believe that as early as mid-June we began contacting Electronic Evidence Discovery, Inc., who is our vendor that helped us retrieve the e-mails. And as we represented to the magistrate on [July 12th], we were getting help doing this.

Trial Tr. at 1260.

In response to Judge Arterton's question regarding why RFC had not produced the back-up tapes earlier, RFC's counsel stated:

> It was a decision that we made internally that we endeavored to work with a world class vendor to achieve this—to achieve a result that would be satisfactory both for DeGeorge and for the Court, and we have yet to see that they would have been able to do any better.

*Id.* at 1264.

Replying to Judge Arterton's question regarding why RFC had not turned over back-up tapes created in early 1999 so as to insure that all of the December 1998 e-mails were captured, RFC's counsel told the District Court that RFC had produced back-up tapes from "as late as February of '99 and January of '99." *Id.* at 1266. In fact, however, RFC had not produced any 1999 back-up tapes.

In an oral ruling the next morning (September 20, 2001), Judge Arterton denied DeGeorge's motion. She held that, to ob-

tain an adverse inference charge, a party must show that "[1] the party with control over the evidence had an obligation to preserve it at the time it was destroyed; [2] the party that destroyed the evidence had a sufficiently culpable state of mind; and [3] 'some evidence suggest[s] that a document or documents relevant to substantiating [the claim of the party seeking sanctions] would have been included among the destroyed files.'" Trial Tr. at 1374 (quoting *Byrnie v. Town of Cromwell,* 243 F.3d 93, 107–08 (2d Cir.2001)). RFC did not dispute that it had an obligation to preserve and produce the e-mails; accordingly, Judge Arterton focused on the latter two prongs of the analysis. *See id.* at 1374–75.

With respect to the second prong, Judge Arterton found, citing *Reilly v. Natwest Markets Group Inc.,* 181 F.3d 253, 267–68 (2d Cir.1999), that DeGeorge was not entitled to an adverse inference instruction because it had not established that RFC acted with "bad faith" or "gross negligence." She gave two reasons for this conclusion. First, she found that RFC's explanation that it decided to use an outside vendor to retrieve the e-mails rather than turn over the back-up tapes was "neither implausible nor unreasonable," and it was that decision that led to much of the delay. Second, although she recognized that

> subsequent acts by RFC, including representation that e-mails would be produced, without mentioning the absence of any from the critical time period, a missed Federal Express deadline for sending backup tapes so they could be forwarded to DeGeorge's vendors, and resistance to responding to technical questions about the tapes, suggests a somewhat purposeful[ ] sluggishness on RFC's part,

*id.* at 1376, she found that these acts would not have resulted in the unavailability of the evidence absent the "compressed time-line both parties were operating under." *Id.* at 1376–77.

Judge Arterton also held that DeGeorge had failed to establish that the e-mails would be helpful to it, as it "ha[d] not identified anything, apart from the nonproduction itself, suggesting that [the unproduced e-mails] would likely have been harmful to RFC." *Id.* at 1377–78.

Mindful that the e-mails had not been destroyed but rather not timely produced, Judge Arterton noted that:

> Should material evidence surface that is adverse to RFC after trial from the eventual disclosure of these e-mails, it might be the basis for post-trial motions, since it would obviously appear to fit within the category of being newly discovered and unavailable at the time of trial.

*Id.* at 1377.

That day (September 20, 2001) was the last day evidence was presented in the case. The following Monday, September 24, 2001, the jury heard closing arguments, received the charge, and reached a verdict in favor of RFC for $96.4 million. Judgment on the jury's verdict was entered on September 26, 2001. This appeal followed.

On appeal, DeGeorge argues that (1) the District Court erred in holding (a) that it was required to establish "bad faith" or "gross negligence" to show that RFC acted with a sufficiently culpable state of mind so as to warrant sanctions, and (b) that it was required to show that the e-mails would have been harmful to RFC; and (2) the District Court's denial of its motion for sanctions was based on a "clearly erroneous view of the evidence." DeGeorge Br. at 8–9. DeGeorge asks us to vacate the judgment of the District Court and remand for a new trial.

## II. DISCUSSION

### A. The Nature of the Alleged Breach of a Discovery Obligation

At the outset we note that, although the relief DeGeorge requested in its motion for sanctions was an adverse inference instruction, which usually is employed in cases involving spoliation of evidence, and the District Court accordingly decided DeGeorge's motion using our law on adverse inference instructions in the context of spoliation, this is not a typical spoliation case. It does not appear that RFC *destroyed* the e-mails on the back-up tapes. Rather, RFC failed to produce the e-mails in time for trial. Accordingly, this case is more akin to those in which a party breaches a discovery obligation or fails to comply with a court order regarding discovery.

Rule 37(b)(2) of the Federal Rules of Civil Procedure provides, in relevant part, that if a party fails to obey a discovery order, the court "may make such orders in regard to the failure as are just," including, but not limited to, "[a]n order that . . . designated facts shall be taken as established for the purposes of the action in accordance with the claim of the party obtaining the order." Fed.R.Civ.P. 37(b)(2)(A). Rule 37(b) also provides that, in lieu of or in addition to any other appropriate order,

> the court *shall* require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

Fed.R.Civ.P. 37(b) (emphasis added). Even in the absence of a discovery order, a

court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs. *DLC Management Corp. v. Town of Hyde Park,* 163 F.3d 124, 135–36 (2d Cir.1998). *See generally Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) ("It has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'") (quoting *United States v. Hudson,* 7 Cranch 32, 34, 3 L.Ed. 259 (1812)).

■ Where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to delay the start of a trial (at the expense of the party that breached its obligation), to declare a mistrial if trial has already commenced, or to proceed with a trial and give an adverse inference instruction. *See Reilly v. Natwest Markets Group Inc.,* 181 F.3d 253, 267 (2d Cir.1999) ("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses."). In the instant case, however, DeGeorge chose not to seek a delay of the trial or a mistrial, but rather sought only an adverse inference instruction. Accordingly, we will not disturb the District Court's denial of DeGeorge's motion unless the District Court abused its discretion in failing to give the requested instruction.

B.   The District Court's Denial of DeGeorge's Motion

■ We review a district court's decision on a motion for discovery sanctions for abuse of discretion. *See, e.g., Selletti v. Carey,* 173 F.3d 104, 110 (2d Cir.1999). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). In the instant case, DeGeorge contends that, in denying its motion for sanctions, the District Court both made errors of law and based its ruling on a clearly erroneous view of the evidence.

1.   *The legal standard for an adverse inference instruction*

■ As the District Court correctly held, a party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Byrnie v. Town of Cromwell,* 243 F.3d 93, 107–12 (2d Cir.2001). Similarly, where, as here, an adverse inference instruction is sought on the basis that the evidence was not produced in time for use at trial, the party seeking the instruction must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had "a culpable state of mind"; and (3) that the missing evidence is "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

RFC did not dispute in its opposition to DeGeorge's motion that it (1) had an obligation to preserve and timely produce the back-up tapes. Accordingly, the only is-

sues before the District Court were (2) whether RFC acted "with a culpable state of mind" in failing to timely produce the e-mails and (3) whether the missing e-mails are "relevant" to DeGeorge's claim or defense such that a reasonable trier of fact could find that they would support that claim or defense.

### a. *The proper legal standard for determining whether RFC acted "with a culpable state of mind"*

■ In determining whether RFC acted "with a culpable state of mind," the District Court specifically discussed only whether RFC acted in "bad faith" or with "gross negligence." *See* Trial Tr. at 1375–76. As we explicitly noted in *Byrnie,* however, the "culpable state of mind" factor is satisfied by a showing that the evidence was destroyed "knowingly, even if without intent to [breach a duty to preserve it], or *negligently.*" *Id.* at 109 (emphasis added). *Reilly v. Natwest Markets Group,* which the District Court cited, is not to the contrary; in that case we held that a "case-by-case approach to the failure to produce relevant evidence" was appropriate because "[s]uch failures occur 'along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality.'" 181 F.3d at 267 (quoting *Welsh v. United States,* 844 F.2d 1239, 1246 (6th Cir.1988)).

The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence. As Magistrate Judge James C. Francis, IV aptly put it,

> [The] sanction [of an adverse inference] should be available even for the negligent destruction of documents if that is necessary to further the remedial purpose of the inference. It makes little difference to the party victimized by the

destruction of evidence whether that act was done willfully or negligently. The adverse inference provides the necessary mechanism for restoring the evidentiary balance. The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss.

*Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 75 (S.D.N.Y.1991). *See generally Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998) (stating that an adverse inference instruction serves the remedial purpose, "insofar as possible, of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party").

Although the District Court properly cited *Reiley* and *Turner,* it explicitly analyzed only whether RFC acted in "bad faith" or with "gross negligence." It is therefore unclear whether the District Court applied the proper legal standard. Ordinarily, we would remand for clarification of this issue, but, in view of our analysis of the remaining issues in this case, such clarification is unnecessary.

### b. *The proper legal standard for determining whether DeGeorge adduced sufficient evidence that the missing e-mails are "relevant"*

■ Although we have stated that, to obtain an adverse inference instruction, a party must establish that the unavailable evidence is "relevant" to its claims or defenses, *Byrnie,* 243 F.3d at 109; *Kronisch,* 150 F.3d at 128, our cases make clear that "relevant" in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evi-

dence.[3] Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that "the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction." *Kronisch*, 150 F.3d at 127; *Byrnie*, 243 F.3d at 110. Courts must take care not to "hold[ ] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence," because doing so "would subvert the ... purposes of the adverse inference, and would allow parties who have ... destroyed evidence to profit from that destruction." *Kronisch*, 150 F.3d at 128; *Byrnie*, 243 F.3d at 110.

Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party. *See, e.g., Kronisch*, 150 F.3d at 126 ("It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction."). Similarly, a showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party.

*See Reilly*, 181 F.3d at 267–68. Accordingly, where a party seeking an adverse inference adduces evidence that its opponent destroyed potential evidence (or otherwise rendered it unavailable) in bad faith or through gross negligence (satisfying the "culpable state of mind" factor), that same evidence of the opponent's state of mind will frequently also be sufficient to permit a jury to conclude that the missing evidence is favorable to the party (satisfying the "relevance" factor).[4]

A party seeking an adverse inference instruction need not, however, rely on the same evidence to establish that the missing evidence is "relevant" as it uses to establish the opponent's "culpable state of mind." For example, in *Byrnie*, the party seeking the adverse inference established relevance through deposition testimony regarding the nature of the missing documents, which we held were likely "relevant" for purposes of an adverse inference in light of the opponent's shifting theory of the case. *Byrnie*, 243 F.3d at 109–10.

In this case, the District Court stated that the only evidence DeGeorge had adduced "suggesting that [the unproduced e-mails] would likely have been harmful to RFC" was the nonproduction itself. Trial Tr. at 1377. It also stated, however, that RFC's actions after it retained EED, "including representation that e-mails would be produced, without mentioning the absence of any from the

3. Rule 401 provides:
   "Relevant evidence" means evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
   Fed.R.Evid. 401 (emphasis in original).

4. Although the issue of whether evidence was destroyed with a "culpable state of mind" is one for a court to decide in determining

whether the imposition of sanctions is warranted, whether the materials were in fact unfavorable to the culpable party is an issue of fact to be determined by the jury. *Byrnie*, 243 F.3d at 109–10. Accordingly, a court's role in evaluating the "relevance" factor in the adverse inference analysis is limited to insuring that the party seeking the inference had adduced enough evidence of the contents of the missing materials such that a reasonable jury *could* find in its favor. *Id.*

critical time period, a missed Federal Express deadline for sending backup tapes so they could be forwarded to DeGeorge's vendors, and resistance to responding to technical questions about the tapes, suggest[ ] *a somewhat purposeful[ ] sluggishness on RFC's part.*" Trial Tr. at 1376 (emphasis added).

It is unclear why the District Court did not consider RFC's acts evincing "purposeful sluggishness" as supportive of DeGeorge's claim that the e-mails were likely harmful to RFC. Just as the intentional or grossly negligent *destruction* of evidence in bad faith can support an inference that the destroyed evidence was harmful to the destroying party, *see, e.g., Kronisch,* 150 F.3d at 126; *Reilly,* 181 F.3d at 267–68, so, too, can intentional or grossly negligent acts that hinder discovery support such an inference, *even if* those acts are not ultimately responsible for the unavailability of the evidence (*i.e.,* even if those acts do not satisfy the "culpable state of mind" factor because they did not cause the destruction or unavailability of the missing evidence). Thus, if any of RFC's acts that hindered DeGeorge's attempts to obtain the e-mails was grossly negligent or taken in bad faith,[5] then it could support an inference that the missing e-mails are harmful to RFC.

\* \* \*

Because the District Court used the wrong legal standard in denying DeGeorge's motion, its decision was "based . . . on an erroneous view of the law." *See Cooter & Gell,* 496 U.S. at 405, 110 S.Ct. 2447. Accordingly, the District Court

abused it discretion in denying DeGeorge's motion. *See id.*

## 2. *The District Court's Factual Findings*

DeGeorge also challenges the District Court's factual findings on bad faith and gross negligence. The District Court found that RFC's failure to timely produce the e-mails was neither in bad faith nor grossly negligent[6] because (1) RFC's explanation that it decided to use an outside vendor to retrieve the e-mails rather than turn over the back-up tapes was "neither implausible nor unreasonable" and it was that decision that led to much of the delay; and (2) although RFC's subsequent actions evinced a "purposeful sluggishness," those acts would not have resulted in the unavailability of the evidence absent the "compressed timeline both parties were operating under." Trial Tr. at 1376–77. DeGeorge argues that these findings were clearly erroneous because (1) there was no explanation as to why e-mails from the back-up tapes were produced for January through September 1998 but not from October through December of 1998; and (2) RFC's actions amounted to more than "purposeful sluggishness."

It appears to us that, in the press of deciding this motion in the midst of trial, the District Court overlooked some evidence that could support a finding that RFC acted in bad faith or was grossly negligent. For example, the District Court did not appear to consider, in finding that RFC's explanation regarding its retention of EED was "neither implausible

---

5. It appears that the District Court did not consider whether RFC's "purposefully sluggish" acts were grossly negligent or taken in bad faith, because it had already decided that those acts did not cause RFC's failure to timely produce the e-mails. Rather, the District Court found that the reason RFC did not

produce the e-mails was that it hired a vendor that was unable to retrieve them.

6. As discussed above, the District Court did not make an explicit finding as to whether RFC acted with ordinary negligence.

or unreasonable," the timing of the decision to retain EED. According to RFC's in-house counsel, "RFC retained EED in mid-June 2001," after he had determined that "RFC did not have the internal resources necessary to retrieve [the e-mails from the back-up tapes] in the permitted time frame." Decl. of Michael McGuire dated Sept. 19, 2001, ¶¶ 3–4.[7] RFC first informed DeGeorge that it had been unable to retrieve e-mails from the back-up tapes in early July 2001—weeks after it retained EED. When DeGeorge brought the issue to the attention of Magistrate Judge Margolis at the July 12, 2001 conference, RFC told both the Magistrate Judge and DeGeorge that it *would* seek a vendor's assistance in retrieving the e-mails. In its September 19, 2001 brief to the District Court opposing DeGeorge's motion for sanctions, RFC stated that it "formally" retained EED on July 14, 2001, and it attached a contract between RFC and EED purportedly executed on that date as exhibit 3 to that brief.

This evidence raises a number of questions. For example, if RFC determined in mid-June that it lacked the resources to retrieve the e-mails and therefore retained EED to assist it in the task at that time, its early July 2001 statement to DeGeorge that it was unable to retrieve e-mails was presumably based not only on its own inability to retrieve the e-mails, but also on its inability to retrieve the e-mails *with the assistance of EED.* If so, RFC's decision to continue to use EED's services in an effort to retrieve the e-mails may not have been reasonable. If, on the other hand, RFC did *not* obtain EED's assistance before it told DeGeorge in early July that it had been unable to retrieve e-mails from the back-up tapes, it should explain (1)

why it delayed telling DeGeorge of its inability to retrieve messages until weeks after its in-house lawyer determined that it could not do so, and (2) why it failed to obtain outside assistance as soon as it determined it could not retrieve e-mails on its own.

In a similar vein, it is unclear whether the District Court considered the reasonableness of RFC's continued reliance on EED throughout months of apparently fruitless attempts to retrieve the critical e-mails, in light of the ability of DeGeorge's vendor to identify and begin to retrieve those e-mails in just four days. The explanation for this apparent discrepancy in competence offered by EED Project Manager Christopher Mashburn—namely, that DeGeorge's vendor had a "head start" because of technical information supplied by RFC—is thoroughly unconvincing. The "technical information" RFC supplied DeGeorge in response to DeGeorge's questions consisted merely of the identification of the software used, the identification of the type and basic parameters of the tapes, and the fact that the tapes included back-ups from both servers and workstations. Letter from S. Derringer to E. Harris, dated September 6, 2001. This basic information should have been readily available to EED from RFC's technical personnel, and, accordingly, there is no reason to believe that DeGeorge's vendor had any more of a "head start" than EED had.

The record also contains a number of at least careless, if not intentionally misleading, statements by RFC both to DeGeorge and to the District Court regarding the effort to retrieve the e-mails, the character of which statements may not have been fully apprehended by the District Court.

---

7. At oral argument, counsel for RFC stated that he was unsure when RFC retained EED, but that he "st[ood] by" the statements in the affidavits submitted by RFC to the District Court.

For example, in light of the sworn statement by RFC's in-house counsel that "RFC retained EED in mid-June," McGuire Decl.¶3, RFC's statement at the July 12, 2001 conference to the effect that it *intended* to hire a vendor, coupled with its failure to inform the Magistrate Judge that it had already "retained" that vendor weeks earlier and its careful use of the word "formally" to describe its purported "retention" of EED in July 2001, suggests a deliberate attempt to mislead both De-George and the District Court. Similarly, RFC's counsel told the District Court during argument on DeGeorge's motion for sanctions that it had produced back-up tapes through early 1999, when in fact it had produced only back-up tapes through December 1998. *See* Trial Tr. at 1266.

In addition to our doubts over whether the District Court fully considered all of the evidence, we are uncertain whether the District Court appreciated that as a dis-covery deadline or trial date draws near, discovery conduct that might have been considered "merely" discourteous at an earlier point in the litigation may well breach a party's duties to its opponent and to the court. In the circumstances pre-sented here—*i.e.*, trial was imminent and RFC had repeatedly missed deadlines to produce the e-mails—RFC was under an obligation to be *as cooperative as possible.* Viewed in that light, RFC's "purposefully sluggish" acts—particularly its as-yet-unexplained refusal to answer basic techni-cal questions about the tape until prompt-ed to do so by the District Court—may well have constituted sanctionable miscon-duct in their own right.

Despite these doubts, we need not and do not decide whether the District Court's factual findings were clearly erroneous, be-cause the District Court will have to re-evaluate those findings in the context of the proper legal standard.

## C. Our Instructions on Remand

As noted above, this case differs from the typical spoliation case because the evi-dence at issue was apparently not de-stroyed, but merely not timely produced. Thus, on remand, the District Court should not decide whether, had it applied the proper standard, it would have granted DeGeorge's motion. Rather, DeGeorge should be given an opportunity to renew its motion for sanctions, with the benefit of discovery—including, but not necessarily limited to, reexamination of the back-up tapes and appropriate depositions of RFC's affiants—and, if appropriate, an ev-identiary hearing before the District Court. Upon consideration of any such motion, the District Court should vacate the judgment and order a new trial if DeGeorge establishes that RFC acted with a sufficiently culpable state of mind (as described above) and that DeGeorge was prejudiced by the failure to produce the e-mails. Presumably, DeGeorge would at-tempt to establish prejudice by pointing to specific e-mails that it would have used at trial; if so, the District Court should con-sider the likelihood that the newly pro-duced e-mails would have affected the jury's verdict, in light of all of the other evidence adduced at trial.

If the District Court finds that RFC acted with a culpable state of mind, but that DeGeorge was not prejudiced, it should consider whether lesser sanctions, including, but not limited to, awarding De-George the costs of its motion for sanc-tions and this appeal, are warranted. Moreover, although it is now our holding that, absent a showing of prejudice, the jury's verdict should not be disturbed, the District Court should also consider wheth-er, as a sanction for discovery abuse, RFC should also forfeit post-judgment interest for the time period from the date of the

entry of judgment until the entry of the District Court's decision on remand.[8] Finally, if the District Court concludes that RFC's failure to timely produce the e-mails was not caused by acts taken with "a culpable state of mind," it should separately consider whether RFC's acts of "purposeful sluggishness" nevertheless warrant the imposition of sanctions. District courts should not countenance "purposeful sluggishness" in discovery on the part of parties or attorneys and should be prepared to impose sanctions when they encounter it.

### III. Conclusion

In sum, we hold that:

(1) where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, a District Court has broad discretion in fashioning an appropriate sanction, including the discretion to delay the start of a trial (at the expense of the party that breached its obligation), to declare a mistrial if trial has already commenced, or to proceed with a trial with an adverse inference instruction;

(2) discovery sanctions, including an adverse inference instruction, may be imposed upon a party that has breached a discovery obligation not only through bad faith or gross negligence, but also through ordinary negligence;

(3) a judge's finding that a party acted with gross negligence or in bad faith with respect to discovery obligations is ordinarily sufficient to support a finding that the missing or destroyed evidence would have been harmful to that party, even if the destruction or unavailability of the evidence was not caused by the acts constituting bad faith or gross negligence; and

(4) in the instant case, the District Court applied the wrong standard in deciding DeGeorge's motion for sanctions.

Accordingly, we vacate the order of the District Court denying DeGeorge's motion for sanctions and remand with instructions to permit DeGeorge to renew its motion for discovery sanctions.

Costs to DeGeorge.

Ovalee BAREFOOT; George Wrage; Sharon Allen; Nicholas Fokakis; Algeron Lee Butler, Jr.; Susan Deibert Butler; John Ellis Bryant; Sherry Williams Bryant; Theodore Herring Hewlett, Sr.; Ann Joyce Hewlett; William Addison Hurst; Lillian Williamson Hurst; Miles Creamer Higgins; Margaret Glendy Williard Higgins; Miles Creamer Higgins, III; Colleen Mithcel Higgins; Janet Moore Hicks; John Russell Hicks; Carolyn Timms Hicks; Albert Emerson Willard; Elizabeth White Willard; Martin Stevenson Willard; Gabrielle Holmes Willard; Richard Bentley Waldkirch; Carol Welch Waldkirch; Sally Hicks Reardon; William Martin Willard; Thomas Leo Joyce; Suzanne Spence Joyce; John James Ormond; David Lewis Ormond; Mary Cain Ormond; Claude Huntley McAllister, Jr.; Nancy Hardacre McAllister; Kevin Slean Scully; Madeline Margurite Scully; Harriett Rieman; Jack A. Alford; Allan L. Antes; Jane L. Antes; Joseph

---

**8.** DeGeorge did not appeal on any ground other than the District Court's denial of its motion for sanctions. Accordingly, we conclude that absent RFC's failure to timely produce the e-mails, DeGeorge would have satisfied the judgment shortly after it was entered.