**CREATIVE RESOURCES GROUP OF NEW JERSEY, INC., Plaintiff,**

v.

**CREATIVE RESOURCES GROUP, INC., and Alan Bart, Defendants.**

**Alan Bart, individually and on behalf of Creative Resources Group, Inc., Defendants and Counterclaim Plaintiffs,**

v.

**Creative Resources Group of New Jersey, Inc., and Marc DiGiorgio, Counterclaim Defendants.**

**No. CV 00–1565(TCP)(WDW).**

United States District Court, E.D. New York.

Oct. 29, 2002.

---

Rosenfeld & Kaplan, L.L.P., by Tab K. Rosenfeld, New York City, for Plaintiff/Counterclaim Defendant.

Bart and Schwartz, LLP, by Gerald V. Dandeneau, Melville, NY, for Defendants/Counterclaim Plaintiffs.

## REPORT & RECOMMENDATION & ORDER

WALL, United States Magistrate Judge.

Before the court is the renewed motion by the plaintiff and counterclaim defendant, Creative Resources Group of New Jersey ("CRGNJ"), for sanctions against the defendants and counterclaim plaintiffs, Alan Bart and Creative Resources Group, Inc. ("CRG"). For the reasons set forth *infra*, the court will order monetary sanctions in the amount of $34,400.00 in reasonable attorney's fees and costs against individual defendant Alan Bart, and will recommend to District Judge Thomas C. Platt that an adverse inference jury instruction be given at trial against both Bart and CRG.

## BACKGROUND

This renewed motion for sanctions is the culmination of a tortuous discovery process in this two and a half year old case. The plaintiff commenced this action in March 2000, seeking to recover $98,248.74 in commissions allegedly owed to it by the defendant CRG under the terms of CRG's administrator agreement with Caliber One Indemnity Insurance Company. See Rosenfeld Decl. in Supp. at ¶ 2. The plaintiff claims that, under the Agreements, CRG acted as managing general agent for Caliber One for insurance programs for certain industries, including loggers and hazmat transporters. The plaintiff, CRGNJ, acted as the "administrative back office for these programs." *Id.* In exchange for CRGNJ's services, CRG agreed to pay CRGNJ specified percentages of the premiums paid by the insureds in the various industries. *Id.* Defendant Alan Bart was a fifty percent shareholder of CRG. *Id.* at ¶ 4.

In November 1999, CRG's other fifty percent shareholder, Philip Miller, accused Bart of falsifying insurance premium amounts on the declarations pages of the insurance policies issued to Miller's catering industry clients. *Id.* These alleged acts occurred in connection with the Caterers Insurance Program, in which CRG acted as managing general agent. Bart's affiliated and wholly owned brokerage company, Total Coverage Agency, Inc., acted as the broker of record. *Id.* Plaintiff contends that the Caterers Program malfeasance led to a series of events that harmed it and led to the commencement of this lawsuit. *Id.* at ¶ 5. Specifically, the plaintiff claims that the Caterers Program events caused Bart to wrongfully refuse "to remit premiums to Caliber One, resulting in Caliber One's termination" of the hazmat and loggers programs and "led Bart to inexplicably refuse to sign plaintiff's commission checks resulting in the commencement of this lawsuit" in March 2000. *Id.*

In April 2000, the defendants filed their Answer and Counterclaims. In June 2001, the plaintiff made a motion to dismiss the counterclaims, and District Judge Platt heard argument on July 21, 2001. Although there is disagreement between counsel as to the precise result of the motion to dismiss, the upshot of it was that the defendants were given twenty days in which to file amended counterclaims. In his papers, counsel for the plaintiff states that the amended counterclaims were filed on August 16, 2001 and were answered on August 31, 2001. Rosenfeld Decl. at ¶¶ 7–8. The court's docket, however, does not reflect the filing of either document.

Prior to the motion to dismiss the counterclaims and its aftermath, and after various delays and adjournments, an initial conference was held before the undersigned on November 2, 2000, at which it became clear that the parties had not complied with their Rule 26 obligations. A second initial conference was held on December 13, 2000, a discovery schedule was entered into, and discov-

ery commenced. Relevant to the current motion for sanctions,[1] in July 2001 plaintiff served its Second Request for Production of Documents on the defendants. See Rosenfeld Decl., Ex. B. The request covered a broad range of documents pertaining, *inter alia*, to the Caterers Program, including "(a) documents relating to the authorization to issue as well as the issuance by defendants of any and all finance agreements relating to the Caterers program; (b) invoices sent by Bart or Total Coverage Agency, Inc. to clients or customers in connection with the Caterers Program; (c) any indication of payment by Bart, Total Coverage or CRG in connection with the Caterers Program; (c)[sic] any insurance policies, drafts, finance agreements, checks, correspondence or other documents issued, created, sent or received pertaining to the Caterers Program; and (d) any production reports issued by CRG, Bart or Total Coverage in connection with the Caterers Program." Rosenfeld Decl. at ¶ 9.

In August 2001, the defendants responded in writing to the demand, conditioning the document production on the plaintiff's execution of a confidentiality agreement.[2] *Id.* at ¶ 10. The defendants ultimately agreed to make all of CRG's and Total Coverage's records available at their shared offices. *Id.* In October 2001 plaintiff visited the offices and inspected the documents from CRG and Total Coverage. *Id.* at ¶ 11. A review of the documents revealed that certain documents that the plaintiff expected to find were missing, notably, policy declarations pages, finance agreements, client applications, premium notices, invoices, insurance binders, rating sheets and finance agreements that could provide evidence of the premiums that Bart had charged. *Id.* at ¶ 11.

The plaintiff sent a letter to court dated October 27, 2001, noting the defendants' failure to produce the documents and requesting an extension of the discovery deadline. In that letter, the plaintiff noted the "absence of critical records missing from the files of Mr. Bart, CRG and Total Coverage Agency," specifying the absence of "the majority of the declaration pages from the insurance policies and virtually all of the financing agreements and related documents pertaining to the 1999 policy years for insureds covered under the Caterers program." 10/27/01 Letter at 2. The plaintiff stated its intention to try to get the missing documents from third party discovery to "substantiate its [counterclaim] defense relating to defendant Bart's falsification of insurance policy declaration pages and financing agreements." *Id.* at ¶ 11, Ex. C. The plaintiff explained that it needed to get documents that reflected "the true premium numbers." *Id.* at 3. The court granted a thirty day discovery extension.[3]

Defendant Alan Bart was deposed in November 2001 and testified, *inter alia*, about the contents of the files maintained by Total Coverage Agency and CRG. At his deposition, he testified that the documents that the plaintiff claimed were missing from the production were the kinds of documents that insurance brokers kept in the normal course of business, for example, applications with underwriting information, rating analyses, applications containing the insurance company's approved premium number, the insurance policies, executed finance agreements and insurance binders. See Nov. Tr. at 60–66, 90–92, Rosenfeld Decl., Ex. D. Bart also testified that "the work file that a broker or general agent keeps on his record about a particular account," existed for both Total Coverage and CRG (*id.* at 95), that the CRG client files contained a copy of each insurance file issued by the insurance company (*id.* at 66), and that the Total Coverage client files contained copies of the written insurance binder and the signed finance agreements (*id.* at 95).

---

1. The court notes that conferences and motions not mentioned in this Order took place. Because they are not relevant to the current motion, they have been omitted from the procedural history.

2. The defendants' condition was later withdrawn as to certain insurance brokerage agreements that would have been shared with third parties in the usual course of business. See Rosenfeld Decl. at ¶ 10.

3. The discovery deadline was again extended at a conference held on December 12, 2001, at which time a pretrial conference was scheduled for February 26, 2002.

Bart also testified that, after a dispute with his business partner, Philip Miller, in November 1999, Bart "secured" all of the Total Coverage records in his own office. *Id.* at 312–13. There was no discussion of how any of those documents might have "gone missing." In response to the question, "To the best of your knowledge, at the time you took the documents and secured them in the office, all of the files were still in your office?" Bart answered, "Yes." *Id.* at 317. The inescapable inference flowing from his testimony is that the insurance documents sought in the document demand did exist, had been placed by Bart in his office in November 1999, four months prior to the commencement of this lawsuit, and were, according to Bart's sworn testimony, still secured in his office as of November 13, 2001, when his deposition took place.

On or about January 10, 2002, plaintiff CRGNJ served a "follow-up" document subpoena on non-party Total Coverage. Rosenfeld Decl. at ¶ 14 & Ex. E. Plaintiff claims that this subpoena was "the result of painstaking efforts to obtain information from third parties which would identify some of the documents missing from Bart's prior production," and was issued "in response to repeated comments by Bart's attorneys that the insurance records identified by Bart at his November 13, 2001 deposition as having been 'secured' had been overlooked by plaintiff during the review and document inspection conducted by plaintiff in October 2001." *Id.* The court notes that the defendants' comments that some of the missing documents had been overlooked by plaintiff's counsel, which is tantamount to a statement that those documents existed as of October 2001, is at odds with the later claims that the documents were missing or nonexistent.

The documents sought in the subpoena fell into two general categories—insurance documents (sought in paragraphs 1 to 36 and 40) and bank records (sought in paragraphs 37 and 41–44). Defendants responded by stating that all of the documents in response to paragraphs 1 to 36 and 40—the insurance documents—would be made available if they were in the defendants' possession, and refusing to produce the Total Coverage bank records sought in paragraphs 37 and 41 to 43 [4] of the January 10th subpoena. *Id.* at ¶ 15. Paragraph 37 sought information relating to the removal of $100,000 from the Loggers Premium Account maintained by CRG/Bart into an account controlled by Total Coverage/Bart. Such information is relevant to the plaintiff's claim that Bart misappropriated at least $100,000. *Id.* at p. 3, n. 2. Paragraphs 41–44 sought Total Coverage banking records that the plaintiff believed would show the transfer of funds from various CRG accounts to Total Coverage accounts controlled by Bart, to the detriment of the plaintiff and counterclaim defendant Marc DiGiorgio. Plaintiff argued that these documents, would, at the least, "raise a question as to whether Mr. Bart may have been engaged in the diversion of funds from CRG to Total Coverage." Rosenfeld Letter 2/13/02 at 2.

On February 13, 2002, plaintiff moved for an order compelling the production of the Total Coverage documents demanded in the January 10th subpoena. *Id.* at ¶ 16 & Ex. F. Defendants opposed the motion on behalf of Total Coverage in letters dated February 15 and February 25, 2002. They argued that some of the documents sought were not in their possession, did not exist, or were not relevant to issues in the lawsuit. At a telephone-status conference on February 26th, the discovery issues were discussed. During the conference, defense counsel told the court that he would produce the documents sought in paragraphs 1–36 and 40 of the subpoena (the insurance records), but continued to oppose the production of the bank records. By order dated March 4, 2002, the undersigned ordered the defendants to produce the bank records called for in paragraphs 37, 41, 42 and 43 no later than March 22. It was understood that the documents responsive to paragraphs 1–36 & 40 would be produced without the necessity of a court order.

Around this time, an application was made for the substitution of new counsel for defen-

---

**4.** It is unclear from the motion papers whether the defendants produced the documents sought in paragraphs 38, 39 and 44, which were not mentioned in the letter.

dants CRG and Bart. See Dandeneau Letter dated 3/14/02. Although no formal substitution had yet been made, in a letters dated March 26 & 28, 2002, the proposed new counsel, Gerald Dandeneau, requested a "modification" of the March 4th order compelling the production of the Total Coverage documents. The letters did not, however, specify the precise nature of the modifications sought.

By letter dated April 2, 2002, the plaintiff informed the court that the defendants had not complied with the March 4th order and sought sanctions. Rosenfeld Decl. ¶ 19, & Ex. G. By order dated April 8, 2002, the undersigned allowed the substitution of counsel and denied the "modification" sought by the defendants. The defendants were ordered to comply with the March 4th order immediately. They did not do so.

On April 25th,[5] the plaintiff made a motion pursuant to Fed.R.Civ.P. 37.3, seeking to compel the defendants' compliance with the March 4th and April 8th orders, and to compel Mr. Bart's appearance at his continued deposition. Plaintiff also moved for sanctions "based upon defendant's continued and willful failure to comply" with the court's prior orders. Id. at ¶ 21 & Ex. I. The plaintiff argued that the defendants refused to turn over the bank records and that Bart would not appear for the continuation of his deposition. The defendants opposed the motion by letter dated April 29, 2002, arguing that they had sent the "numerous documents," presumably the bank records ordered to be produced in the March 4th and April 8th orders, to Kinko's for copying and that the plaintiff could obtain them by sending a check for the copying costs. At this point, the plaintiff was still operating under the assumption that the defendants would produce the requested insurance documents without further court intervention, as the defendants had represented to the plaintiff and to the court they would do. The defen-

dants also took the position that Bart's deposition had already concluded and that there had been no prior court order that he appear. Plaintiff stated that the defendants had agreed to produce Mr. Bart.

On May 7, 2002, a conference was held, and the undersigned ruled from the bench that sanctions, the precise nature of which would be determined after a review of the record, would be imposed against the defendants. On May 9, 2002, before any order regarding the sanctions could be issued, the defendants moved for reconsideration of the decision to sanction them, although no specific sanction had yet been announced. The defendants claimed that they had complied with the court's orders by producing documents responsive to demands numbered 37, 41, 42, 43 and 44 "to the extent that any such documents are available and in [Bart's] control and custody." Dandeneau Letter of 5/9/02 at 1. The letter also stated that Bart would appear for an additional day of deposition.

In support of the motion for reconsideration, Alan Bart filed an affidavit in which he stated for the first time in regard to some of the bank documents that he had been ordered to produce that "no such documents exist." Bart Aff., dated 5/9/02 at ¶ 3. He also stated that he did not have certain other documents and did not know their location. Id. The plaintiff, opposing the motion, pointed out the incredible nature of most of Bart's claims that certain documents did not exist. For example, the plaintiff noted that Bart had been ordered to produce checks and deposit slips for three separate Total Coverage bank accounts, and that Bart's claim that "no such documents exist" was belied by the fact that Bart had produced "an arbitrary sampling of checks and deposit slips" from the accounts, but withheld others. Rosenfeld Letter, 5/16/02 at 2–3. The plaintiff also pointed out that Bart's claim that he "did not

5. Around April 25, the plaintiff also served its Third Request for the Production of Documents. Rosenfeld Decl., Ex. N. In his Declaration, counsel for the plaintiff complains that the defendants have *wrongfully refused* to produce a Confession of Judgment that Bart allegedly has given to his former counsel, sought in the Third Request. The defendants argue that the document is privi-

leged. A review of the record does not show that a motion to compel that document was ever made by the plaintiff, and the court declines to consider the issue until such a motion is made. The same is true of the defendants' claim that the plaintiff has failed to produce certain documents demanded in discovery. See 9/9/02 Dandeneau Letter at 2 and Dandeneau Decl., Ex. B.

have" the application, corporate resolution and signature cards for each of the Total Coverage bank accounts was incredible. *Id.* In this regard, the plaintiff argued that inasmuch as Mr. Bart was the sole custodian of the bank documents, the inference must be drawn that Bart either destroyed the documents or was willfully refusing to produce them. *Id.* at 2. Finally, the plaintiff reported that the insurance documents, which the defendants had agreed to produce, had, like the bank documents, not been produced. *Id.*

A conference was held on May 30, 2002. After hearing argument from both sides, the undersigned found that the defendants had not complied with the prior orders of the court and concurred with the plaintiff's argument that Bart's claims that he did not have certain documents or that they did not exist were incredible at best. The civil conference sheet filed after the May 30th conference did not address the sanctions, but again ordered compliance with the discovery demands by June 7, 2002, and again ordered the continued deposition of Mr. Bart. The intention of the undersigned was to use the transcript of the oral argument on May 30th as a basis for specifying the sanctions that would be imposed. Unfortunately, it was later learned that the courtroom recording device that was supposed to make a record of the conference had malfunctioned, and no transcript of the proceeding was available on which to base an order.

Prior to appearing for his continued deposition, Bart issued a new response to the January 10th subpoena, specifically referring to the insurance documents. See Rosenfeld Decl. at ¶ 26. In it, Bart stated for the first time that Total Coverage no longer had many of the insurance documents that he had previously testified were among the records he "secured" in November 1999. As noted earlier, Bart had previously stated, in his affidavit of May 9, 2002, that he did not have most of the bank documents or that they did not exist. He reiterated these claims at his deposition on June 12, 2002. See Rosenfeld Decl., Ex. A. The plaintiff argues that Bart's testimony at his deposition on June 12 "reveals a litany of spoilation of evidence material to plaintiff's defense of

the Counterclaims." *Id.* at ¶ 26. Indeed, Bart's testimony as to the missing documents consists of repeated statements that he simply did not know what had happened to them, whether or not some of them had been discarded, who may have discarded them, or when they may have been lost. *Id.* at ¶¶ 27–29 & citations to transcript set forth therein. Moreover, some of his June 2002 testimony contradicts his testimony in November 2001 about the records he kept. *Id.*

Because the transcript of the May 30th conference had been lost, a conference was held on July 8, 2002, to discuss with the attorneys for both parties their understanding of the oral rulings from the May 30th conference. The parties agreed that sanctions had been imposed, but that the precise nature of those sanctions had not been determined. At the July 8th conference, Bart was ordered to appear for a deposition for the express purpose of verifying the extent of his discovery abuses and to provide an additional basis for the fashioning of sanctions. The parties were given a briefing schedule for the submission of papers regarding the sanctions, to include Bart's deposition transcript. See 7/08/02 Civil Conference Sheet. Bart was deposed on July 17, 2002. See Rosenfeld Decl., Ex. A. The court reserved decision on the defendants' motion for reconsideration.

The requisite papers were timely filed by both sides, and on September 25, 2002, oral argument was heard on the renewed motion. From the bench, the undersigned denied the motion for reconsideration and imposed two sanctions on defendants: (1) individual defendant Alan Bart will pay a monetary sanction in the reasonable amount incurred by the plaintiff as a result of the defendants' discovery abuses, and (2) an adverse inference charge should be given at trial, instructing the jury that it may infer that the missing documents would have been detrimental to the defendants/counterclaim plaintiffs, Alan Bart and CRG. The two sanctions are discussed in greater detail *infra.*

## DISCUSSION

As noted *supra*, the court has imposed both a monetary sanction against Bart and

an adverse inference instruction sanction against both defendants, based on the defendants' discovery conduct. The Second Circuit has recently reiterated a court's general power to impose sanctions in the discovery context, holding that where "the nature of the alleged breach of a discovery obligation is the non-production of evidence, a District Court has broad discretion in fashioning an appropriate sanction." *See Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir.2002).

Federal Rule of Civil Procedure 37 specifically addresses discovery sanctions where, as here, a party fails to obey a discovery order. Rule 37(b)(2)(A) provides that the court "may make such orders in regard to the failure as are just," including, but not limited to, "[a]n order that ... designated facts shall be taken as established for the purposes of the action in accordance with the claim of the party obtaining the order." Rule 37(b) also provides that in lieu of or in addition to another appropriate order, "the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust."

■ Even in the absence of a discovery order, "a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding*, 306 F.3d at 106–107 (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 135–36 (2d Cir.1998)). Where the nature of the alleged breach of a discovery obligation is the failure to produce evidence, a district court thus has "broad discretion in fashioning an appropriate sanction, including the discretion to delay the start of a trial ..., to declare a mistrial if trial has already commenced, or to proceed with a trial and give an adverse inference instruction." *Id.* at 107 (citing *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 267 (2d Cir.1999)).

As noted earlier, the undersigned is ordering the monetary sanction pursuant to Rule 37 and in keeping with the jurisdiction bestowed in 28 U.S.C. § 636(b)(1)(A) allowing a magistrate judge to "determine any pretrial matter pending before the court." The undersigned will, on the other hand, recommend, not order, the adverse instruction sanction. Although the circumstances warranting that sanction occurred in the pretrial context of discovery abuses, and the undersigned has jurisdiction to impose discovery sanctions, the sanction itself will, if adopted, be applied at the trial to be presided over by District Judge Platt. Moreover, although the adverse inference sanction is not technically dispositive, it may have an effect on the defendants' ability to prove its counterclaims or maintain its defenses. Thus, the recommendation procedure, which will entitle the defendants to a de novo review of the ruling if they oppose the sanction, seems more appropriate. With these sanction powers in mind, the court turns to the specific sanctions imposed.

### 1. *Alan Bart shall pay the plaintiff's reasonable fees and costs incurred by reason of the defendants' discovery abuses:*

■ As noted *supra*, Rule 37 allows for the imposition of sanctions in the form of reasonable fees and costs incurred by reason of a party's discovery failures. This court finds that the plaintiff was forced to expend wholly unnecessary time and effort in its unsuccessful attempts to get the defendants to comply with their discovery obligations. This waste of time and resources was caused by the defendants' bad conduct, which required the plaintiff to make motions to compel and motions for sanctions. It was also caused in part by the defendants' telling the plaintiff that many of the documents sought did exist, causing the plaintiff to seek them from third parties, only to have Bart later claim that the documents never existed in the first place. Tab Rosenfeld, plaintiff's counsel, has submitted a Declaration dated October 8, 2002 in support of the costs sanction. In it, he seeks legal fees in the amount of $37,270.00 and costs in the amount of $6778.18. The defendants oppose the fee application in the Declaration of Gerald V. Dandeneau dated October 11, 2002.

The defendants argue that the plaintiff is not, as a matter of law, entitled to some of the fees he seeks. The defendants state, for example, that in a Rule 37(b) motion, "only those reasonable attorneys fees incurred by the moving party as a result of the failure to comply with a Court Order may be recovered." Dandeneau Decl. in Opp., 10/11/02 at ¶ 2. The defendants also state that attorney fees are calculated using the lodestar method to compute expenses "incurred in the motion for sanctions, but not expenses incurred in obtaining the Order compelling discovery." *Id.* at ¶¶ 2–3. To the extent that the defendants are claiming that fees incurred in a motion to compel are not recoverable under Rule 37, that claim is not simply wrong, but frivolous. Indeed, defense counsel's claim that "the law only provides that attorneys fees be awarded with reference to the work incurred in the motion for sanctions, but not expenses incurred in obtaining the Order compelling the discovery," is so utterly devoid of merit as to approach the threshold of sanctionable behavior in its own right. See *id.* at ¶ 6.

While it is true that Rule 37*(b)* addresses those costs incurred as a result of a party's failure to obey a court order, Rule 37*(a)(4)(A)* expressly provides that parties are entitled to the expenses, including attorneys fees, incurred in making a motion to obtain a court order, unless the court finds that the adversary's position was substantially justified or that other circumstances make an award unjust. The rule provides, in fact, that the losing party on a motion to compel **must** pay reasonable expenses, barring extenuating circumstances. *See* Fed.R.Civ.P. 37(a)(4)(A); *Fund Comm'n Serv., II, Inc. v. Westpac Banking Co.*, 1996 WL 469660, at *4, 1996 U.S. Dist. LEXIS 11937, at *15 (S.D.N.Y. Aug. 16, 1996); *Bowne of New York City, Inc. v. AmBase Corp.*, 161 F.R.D. 258, 262 (S.D.N.Y.1995). Here, no such extenuating circumstances exist.

■ The Second Circuit has held that the imposition of Rule 37(a) monetary sanctions is appropriate as a disciplinary measure "to ensure that a party will not benefit from its own failure to comply with discovery." *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir.1988). "Further, monetary sanctions serve to encourage litigants and their counsel to promptly comply with discovery orders at the risk of being penalized for disobedience." *Fund Comm'n*, 1996 WL 469660, at *5, 1996 U.S. Dist. LEXIS 11937, at *16–17 (citing *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) *(per curiam)*). Here, the plaintiff is entitled to costs incurred both in making motions to compel and in seeking to have the orders that flowed from those motions enforced, as well as to costs incurred in certain third party discovery necessitated by the defendants' bad behavior. The court agrees with the defendants, however, that some of the fees and costs sought are not recoverable, as explained *infra*.

■ Under Rule 37, a party may recover "the reasonable expenses, ... including attorney's fees," incurred in making a motion to compel (see Rule 37(a)(4)(A)) or caused by the failure of the other party to comply with an order of the court (see Rule 37(b)). Fee awards in the Second Circuit are determined according to the "lodestar" formula, which involves calculating the reasonable number of hours spent multiplied by a reasonable hourly rate. *See Fund Comm'n*, 1996 WL 469660, at *6, 1996 U.S. Dist. LEXIS 11937, at *18–19 (citations omitted). It is "incumbent on the party seeking reimbursement to document the 'hours reasonably spent by counsel, and the reasonableness of the hourly rates claimed.'" *Id.* at *6 (quoting *N.S.N. Int'l Indus. N.V. v. E.I. du Pont de Nemours & Co.*, 1996 WL 154182, 1996 U.S. Dist. LEXIS 4050 (S.D.N.Y. Apr. 3, 1996) and citing *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). The court may adjust the lodestar figure based on other criteria. *See id.*

■ As to the hourly rate sought by the plaintiff's attorney, "it is within the judge's discretion to determine reasonable fees based on his or her knowledge of prevailing community rates and the experience of the attorney." *Id.* at *7. The rate charged by Mr. Rosenfeld to the plaintiff was $300 per hour, a rate that the court finds to be reasonable in the context of the "prevailing market

rates of the [ ] legal community in which the trial court sits." *Id.* at *7 (internal citations omitted). Mr. Rosenfeld has not provided information that would allow the court to assess his experience as a factor in the reasonableness of the rate, but, based on the undersigned's knowledge of rates for lawyers practicing in the Eastern District, and on Mr. Rosenfeld's papers and conduct in court, the rate of $300 per hour is found to be reasonable.[6]

As to the hours expended, the plaintiff's attorney has submitted a summary of contemporaneous charges relevant to the sanctions, seeking attorneys fees in the amount of $37,270.00, for approximately 124 hours of work. Mr. Rosenfeld advised the court that the original billing records contained material protected by the attorney-client privilege and the court approved submission of a summary or relevant fees and costs, in lieu of redacted original records. In computing the award, the court relies on Mr. Rosenfeld's representation of relevance. With this in mind, the court finds that although most of the fees and costs set forth in Mr. Rosenfeld's Declaration are compensable, not all of them are. As noted earlier, the court finds that the plaintiff is entitled to fees and costs related to the motions to compel and the motions for sanctions. Moreover, the court finds that a portion of the fees and costs were incurred in extensive third party discovery that would not have been necessary if the defendants had conducted themselves properly in the discovery process, and the plaintiff is entitled to most of those costs. The compensable fees began to accrue on or about October 26, 2001, when Mr. Rosenfeld prepared the October 27th letter to the court that outlined the defendants' discovery failures as of that date.

■ Not all of the fees applied for are compensable, however. For example, some of the fees listed by the plaintiff would have been incurred in the course of normal discovery, for example, appearance at the December 12, 2001 status conference or time spent responding to the defendants' discovery demands. And, assuming that some third party discovery would have been necessary even under ideal circumstances, not all of those costs will be awarded. Moreover, the June 12, 2002 deposition of Mr. Bart, although it ultimately had to be ordered by the court, was a continuation of his deposition as a party to this lawsuit, and the costs associated with it must be rejected. His July 17, 2002, deposition, on the other hand, was a direct result of the defendants' bad conduct, and fees associated with that are awardable. Finally, the conference held on July 8, 2002 would not have been necessary if the court's recording system had not malfunctioned on May 30th, and, although that was not the fault of the plaintiff, neither was it the fault of the defendants, and they should not be required to pay for fees associated with that appearance.

Based on these findings and a thorough review of the Rosenfeld Declaration, the court will reduce the hours claimed from approximately 124 to 100, finding that 100 hours is a reasonable estimate of the number of hours expended by the plaintiff's counsel. Multiplying that by the hourly rate of $300, the lodestar figure to be awarded as attorney's fees is $30,000.

The plaintiff also seeks costs in the amount of $6,778.18. As discussed earlier, the costs related to some third party discovery and to the June 12th Bart deposition, costs that would have been incurred even if the defendants had not engaged in sanctionable conduct, are not compensable. Moreover, costs incurred prior to October 26, 2001, the date that the court has established as the start of the sanctions period, will be rejected. Thus, the transcript fees for the deposition taken on September 26, 2001 and Bart's June 12th deposition, totaling approximately $1470, must be deducted. At least $840 in service of process and witness fees predate October 27, 2001 and they will be deducted as well. Thus, the court finds an award of $4400 in costs to be reasonable.

---

6. Mr. Rosenfeld notes that his hourly rate increased to $350 per hour in 2001, but that the plaintiff was "grandfathered in at the lesser rate of $300 per hour." See Rosenfeld Decl. in Supp. of Fees at ¶ 3.

For these reasons, the court orders that a monetary sanction in the amount of $34,400 is imposed on Alan Bart.

### 2. *An adverse inference instruction regarding both the bank and insurance records should be given to the jury at trial.*

In addition to the monetary sanction, the undersigned finds that an adverse inference jury instruction is warranted by the circumstances of this case. The plaintiff bases its request for the instruction both on Rule 37 and on the defendants' alleged spoliation of the evidence. Indeed, such an instruction is most often given in the spoliation context. *See Residential Funding*, 306 F.3d at 106. As noted earlier, in *Residential Funding*, the Second Circuit reiterated the broad discretion of federal courts to impose discovery sanctions, specifically including adverse instruction sanctions as an appropriate measure not only in the context of intentional spoliation, but also when a party fails to produce evidence through gross negligence or ordinary negligence. *See id.* at *107.

■ The legal standard for the imposition of an adverse inference instruction is essentially the same whether the party controlling the evidence destroyed it or simply failed to produce it. *Id.* at *107. Under that standard, the party seeking such an instruction must show that its opponent had an obligation to preserve or produce the evidence, that the opponent had a "culpable state of mind," and that the evidence was " 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Id.* at *107 (citing *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 107–12 (2d Cir.2001)). The court finds that all three elements are satisfied here in both the spoliation and negligent-failure-to-produce contexts.

### a. The defendants had an obligation to preserve and produce the missing evidence.

■ A party seeking an adverse inference instruction based on the destruction of evidence must first establish that "the party having control over the evidence had an obligation to preserve it at the time it was destroyed." *Byrnie*, 243 F.3d at 107 (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998)). Here, the defendants deny having destroyed evidence, arguing somewhat cryptically that there is no proof that they have "discarded or destroyed relevant post-litigation evidence or even post-document request," although the record is replete with statements by Bart that the evidence is missing. See Dandeneau 9/9/02 Letter at 2. The defendants are right that there is no "hard proof" that evidence was destroyed or of when the destruction occurred, in the sense of an admission by Bart or testimony by a witness to the destruction. However, for the reasons set forth *infra*, this court finds that an inference must be drawn that Bart did destroy evidence after he was on notice of his obligation to preserve or produce it.

■ In arguing against this finding, the defendants focus on the time at which a party's obligation to preserve evidence arises, stating that in the Second Circuit, "the obligation to preserve evidence arises not when the party has notice that the evidence is relevant to litigation, but when a party should have known that the evidence may be relevant to future litigation." *Id.* (citing *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423 (2d Cir.2001)). In fact, the standard set out in *Fujitsu* is an either/or one: "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu*, 247 F.3d at 436 (emphasis added) (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998)).

The defendants suggest that they were not on notice of the documents' potential relevance until the subpoena was served in January 2002, when the documents were already "unavailable." Dandeneau Letter at 2. This is nonsense. This lawsuit was filed in March of 2000, and the defendants were on notice at least as of that date that they had an obligation to preserve relevant evidence. Moreover, many of the documents sought in the subpoena were demanded in the Second Re-

quest for Documents in July 2001, and Bart testified about many of them in November 2001. Thus, the defendants' apparent argument that they were not on notice until January 2002 is entirely devoid of merit.

Significantly, as the defendants recognize, the duty to preserve may arise even prior to the filing of a complaint where a party is on notice that litigation is likely to be commenced. *Id.* at 3 (citing *Rutgerswerke AG v. Abex Corp.*, 2002 WL 1203836, 2002 U.S. Dist. LEXIS 9965 (S.D.N.Y. June 4, 2002)). Here, the dispute between Bart and Miller that arose around November 1999 put Bart on notice that the CRG and Total Coverage records were relevant to potential litigation. Indeed, Bart's sworn statement that he "secured" the documents at that time reflects the importance that he attached to them. This leads the court to find that Bart's obligation to preserve the documents arose as early as November 1999, when the problems with Miller surfaced, and certainly no later than March 2000, when the lawsuit commenced.

Even if the obligation did not arise until this lawsuit commenced in March 2000, the conclusion that Bart was on notice of his obligation before the documents were destroyed is inevitable. As noted *supra*, in November 2001, a year and eight months *after* the lawsuit started, Bart maintained at his deposition that, as far as he knew, the documents were safely secured in his office, having been spirited away from Miller's grasp. Thus, by his own admission, when the lawsuit started, the documents still existed and were in Bart's possession. See Rosenfeld Decl., Ex. D. Only after agreeing to produce certain documents or being repeatedly ordered to produce others did Bart assert that documents were missing or had never existed.

The defendants also argue that "what is critically fatal" to the spoliation claim is the fact that the plaintiff knew as early as October 2001 that "many of the documents which are apparently the subject of the January 10, 2002 request were, in fact, not contained within those files, yet have suggested to this Court that their non-appearance was a result of inappropriate action on the part of the Defendants. This is clearly false." Dandeneau 9/902 Letter at 2. The court fails to see how this is critically, or even a little bit, fatal to the plaintiff's claim that evidence was destroyed. Any knowledge that the plaintiff had as to what documents were missing as of October 2001 is entirely irrelevant to why or how those documents came to be missing.

Even if Bart did not destroy evidence, and his failure to produce the documents is viewed as just that—a failure to produce—an adverse inference instruction is still warranted. Bart had an obligation to timely produce the evidence, which was duly requested by the plaintiff in repeated discovery demands, and he had been ordered by the court several times to do so or had voluntarily agreed to do so. At the very least, the defendants failed to make a good faith effort to search their files and to accurately and timely respond to the discovery demands and to this court's orders. Thus, the obligation element of the adverse inference instruction analysis is met, whether the failure to produce was the result of spoliation or a discovery default.

### b. Bart had the requisite "culpable state of mind."

The "culpable state of mind" element is also satisfied under the circumstances of this lawsuit. The defendants argue that the "Declaration of Mr. Rosenfeld and the testimony of Alan Bart clearly indicate Plaintiff's failure to demonstrate an intentional attempt to destroy any known evidence." Dandeneau Letter at 2 (citing *Fujitsu Ltd.*, 247 F.3d at 436). In *Fujitsu,* the court found that "once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was *intentionally* destroyed, and the likely contents of that evidence." *See* 247 F.3d at 436 (emphasis added). In *Byrnie,* however, the Second Circuit ruled that the "culpable state of mind" factor could be satisfied without intent. 243 F.3d at 108–09. In *Residential Funding,* the Second Circuit's most recent adverse inference analysis, the court applied the rule that intent is not a necessary element. Indeed, the court in *Residential Funding* expressly

held that a finding of intent or gross negligence was not necessary, and that the "sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence." 306 F.3d at 108. As that court aptly observed, an adverse inference provides the necessary mechanism for restoring evidentiary balance. "The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss." *Id.* (quoting *Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 75 (S.D.N.Y.1991) and citing *Kronisch,* 150 F.3d 112, 126 (2d Cir.1998)).

Here, the contradictory testimony of Bart regarding, on the one hand, the maintenance of insurance records and his seizure and placement of them in his personal office, and, on the other hand, their inexplicable lack of existence when it came time to produce them, strongly suggest intent to destroy or hide the evidence. The same is true of Bart's claims that certain bank documents did not exist, despite the common sense inference that such documents would, of necessity, have once existed. Indeed, the incredible nature of Bart's claims about the whereabouts of the documents and whether or not they ever existed leads the court to find that the destruction of the evidence was intentional and done in bad faith.

Even if that intent were absent, however, the circumstances here rise to the level of negligence that satisfies the standard. Bart claims that many of the documents are "missing," but that he has no idea of how they were lost or discarded. At the very least, the circumstances amount to negligence in the preservation of evidence. The "culpable state of mind" element is thus satisfied.

#### c. The missing documents are relevant to this lawsuit.

 Next, the defendants argue, without merit, that the documents at issue are not relevant to this action. "Relevant" in an adverse instruction context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. *Residential Funding,* 306 F.3d at 108. The party seeking the instruction "must adduce sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.'" *Id.* at 109 (citing *Kronisch,* 150 F.3d at 127; *Byrnie,* 243 F.3d at 110). In discussing this element, the Second Circuit noted that courts must take care to not hold a party to too strict a standard of proof regarding the likely contents of the missing evidence, since to do so would "subvert" the purposes of the adverse inference and "would allow parties who have destroyed evidence to profit from that destruction." *Id.* (quoting *Kronisch,* 150 F.3d at 128; *Byrnie,* 243 F.3d at 110).

 Where, as the court has found to be the case here, the party destroys evidence in bad faith, "that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party." *Id.*

Moreover, there is evidence in the record to demonstrate the documents' relevance under a negligence standard. The factual dispute underlying both the allegations in the complaint and the counterclaims and defenses thereto involves the insurance policies issued by the defendants and commissions payable to the plaintiff, with various claims of the defendants' fraud and/or malfeasance that impacted on the commissions the plaintiff was entitled to. The plaintiff sought insurance documents and bank records that may support its claims and/or counterclaim defenses that Bart falsified premiums, defrauded participants in the Caterers Program, funneled money from CRG to Total Coverage or engaged in other acts to the detriment of the plaintiff and the counterclaim defendant, Marc DiGiorgio. While it is not possible to define with specificity every individual document that might have been relevant had the defendants produced them, there are several categories of documents that can be isolated. These include the fi-

nance agreements and insurance policies for the Caterers Program (see Rosenfeld Decl. at ¶¶ 27–29), the Total Coverage Bank Records (*id.* at ¶ 30), and the Budget Installment Corp. documents (*id.* at ¶ 31).

The undersigned found these documents to be relevant in the discovery context when he ordered their production, and now finds them to be relevant in the spoliation context as well. In other words, the court finds that "a reasonable finder of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction,'" here, the plaintiff and the counterclaim defendant, Marc DiGiorgio.

#### d. The Bart/Miller arbitration outcome is irrelevant to this motion.

Finally, the defendants oppose the sanctions motion on the ground that the result of an arbitration between Bart and Philip Miller, which was apparently favorable to Mr. Bart, is somehow dispositive of the issues in this lawsuit and/or on this motion. It is not. The plaintiff was not a party to that arbitration and the defendants have not shown, or even attempted to show, that there is some preclusive effect of the arbitration on this action. The only relevance is that the Bart/Miller dispute put Bart on general notice that the company documents might be relevant to litigation, as noted *supra* in section 2(b).

Because all of the elements warranting an adverse inference instruction are here met, the undersigned recommends that such an instruction be given at trial. Any objections to that recommendation must be filed with the Clerk of the Court with a courtesy copy to the undersigned within 10 days of the date of this Report. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir.1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir.1996).